STATE OF VERMONT

ENVIRONMENTAL COURT

In re: Appeal of Maplewood,  }
Ltd.  }
 }  Docket No. 151-9-01 Vtec
 }
 }

### Decision and Order

Appellant Maplewood, Ltd. appealed from decision of the Development Review Board (DRB) of the Town of Berlin, granting Appellee-Applicant LaGue, Inc.' s revised application. Appellant is represented by Paul S. Gillies, Esq.; Appellee-Applicant Lague, Inc. is represented by Brian J. Grearson, Esq.; the Town is represented by Robert Halpert, Esq. In a previous case, Docket No. 166-8-00 Vtec, the Court had ruled that the application had to be submitted to the DRB for an application under § II(12)(1) for a change, alteration or enlargement to a pre-existing nonconforming use, or for the DRB to act on a variance application, as well as for the DRB to act on the site plan approval required for all three proposed uses. All issues in the previous case are concluded; it was only consolidated with the current case so that any decision of whether to appeal the previous case could be postponed until the current case is concluded.

The revised application was submitted in June 2001, and was referred to the DRB for " site plan approval, cond[itional] use review, non-conform[ing] lot, [and] (?variance)." The DRB' s action approving it resulted in the present appeal. On summary judgment we ruled that the application adequately raised the issue of consideration under § II(12)(1) for a change, alteration or enlargement to a pre-existing nonconforming use, even if the DRB did not apply the § II(12)(1) criteria in its consideration of the application, so that the Court could proceed to consider the application under § II(12)(1).

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took a site visit alone, by agreement of the parties. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellee-Applicant LaGue, Inc. owns a 1.2-acre parcel of land on Paine Turnpike North (" Paine Turnpike" ) in the Commercial (CG) zoning district of the Town of Berlin. The lot in its present configuration, and containing a house, predates the adoption of zoning in Berlin. The house was used as a residence until October of 2001. The lot is rectangular and has 132 feet of road frontage and is approximately 460 feet in depth. It has a curb cut onto Paine Turnpike, located near its southerly property line. It is a nonconforming lot because it lacks sufficient road frontage for a commercial use. Adjoining the property to the south is a vacant 6-acre parcel of land, zoned commercial.

Adjoining the project site to the north is Appellant's property, containing a convenience store and Mobil gasoline station with two curb cuts, which also serve as access to and from the Comfort Inn motel to the west of the convenience store and gas station. The northernmost of these curb cuts is permitted and marked as an entrance only. The southernmost of these curb cuts is permitted and marked as an exit only, two lanes in width, with a right turn exit lane and a left turn exit lane. Not all users of these curb cuts follow the markings regarding the entrance and exit only usage of these curb cuts. To the north of the convenience store and gas station, at the corner of Paine Turnpike and Route 62, is a restaurant also owned and operated by Appellant. It has a divided curb cut onto Paine Turnpike, with a marked entrance lane and a marked exit lane, separated by an island.

Route 62 provides access to Exit 7 of Interstate 89; it travels in an east-west direction. Paine Turnpike intersects with Route 62 at a signalized intersection. On the east side of Paine Turnpike, south of that intersection, is the driveway to an automobile dealership located on the southeast corner of the intersection of Route 62 and Paine Turnpike. Also on the east side of Paine Turnpike, directly across Paine Turnpike from Appellee-Applicant's existing driveway, is the access road for the Shaw's/Staples development. That access road consists of a single entrance lane divided by an island from two exit lanes, one for a right turn and one for a left turn.

The character of the area along Paine Turnpike immediately south of Route 62 is roadside-commercial in nature, even though it becomes residential farther to the south. The proposed project is consistent with and would not adversely affect the character of the area. The landscaping proposed for the project is adequate for screening from the uses to the north and west. No landscaping is proposed for the southerly edge of the property, as all the room on the property is needed to provide on-site circulation; however, the property to the south is vacant and requires no particular screening at the present time.

The intersection of the Shaw's/Staples access road and Appellee-Applicant's existing driveway with Paine Turnpike is not signalized at this time. At the present time, to the south of this intersection Paine Turnpike consists of one lane in each direction. To the north of this intersection, Paine Turnpike consists of one northbound lane, one southbound through lane, and one southbound left turn lane for traffic seeking to enter the Shaw's/Staples access road.

Appellee-Applicant proposes to demolish the existing house on the property and to build a 48' x 64' convenience store building, with fast-food and deli services but only two or three seats, to be set back approximately 150 feet from the front property line.[1] Appellee-Applicant proposes to place three[2] gasoline pump islands under a canopy in front of the building. Appellee-Applicant proposes to operate from 6 a.m. to midnight, daily.

Appellee-Applicant proposes to place passenger car parking spaces on the west, south and east sides of the building, and a fast-food drive-up window and drive-through lane on the north side of the building. An additional lane approximately 24 feet in width is provided to the north of the drive-through lane and to the south of the parking spaces on the south side of the building. A diesel pump island and canopy is proposed westerly of the building, with additional passenger vehicle parking spaces in the rear of the property. No parking spaces or parking area are

provided on the site plan for tractor-trailer-sized vehicles or delivery trucks anywhere on the property.

The curb cut onto Paine Turnpike is proposed to be 60 feet in width, consisting of a 24-foot-wide entrance lane, a 24-foot-wide exit drive painted as two twelve-foot wide exit lanes (one as a left-turn-only lane and the other as a straight-or-right-turn lane) and a painted twelve-foot-wide island. The northerly curb radius of the entrance drive is proposed to be 40 feet, with a beveled concrete mountable curb. The southerly curb radius of the entrance drive is proposed to be 30 feet. There is ample sight distance in both directions at the intersection from the proposed project, at least when snow is not piled at the intersection.

The proposed project is predicted to add 123[3] vehicle trip ends (one-way vehicle trips) in the design hour to the traffic otherwise using Paine Turnpike at the Shaw's/Staples intersection, of which Appellee-Applicant's principal, Mr. Henry LaGue, estimated as much as 20% to 25%[4] would be truck traffic. Appellee-Applicant seemed to suggest at trial that this amount of traffic is less than the difference between that proposed for Shaw's in its Act 250 hearings and that the traffic actually experienced at Shaw's; that is, that the analysis of the intersection made during the Shaw's/Staples project hearings should accommodate the traffic proposed for this new project. However, the added vehicles are proposed to enter the intersection in a different place and to make different turning movements than the intersection would have experienced from the same number of vehicles going into and out of the Shaw's/Staples driveway. Accordingly, they must be analyzed by determining the way that they actually will affect the intersection going from and to the proposed project.

We note that Appellee-Applicant's traffic data also appears to underestimate the design hour volume (30th highest hour in the year) by approximately 20%, because it derived that percentage assuming that highest hour on the Friday before Christmas was the highest traffic volume of the year. Instead, based on the nearest continuous count stations, the highest hour on the Friday before Christmas in 1999 was essentially equal to the 30th highest hour of that year, and should have been used for the design hour volume.

However, even using Appellee-Applicant's traffic data regarding the Shaw's/Staples intersection,[5] the intersection will function at an unacceptably poor level if the project is built. The intersection may function at an unacceptably poor level even if the project is not built, and may warrant the installation of a traffic light, possibly one that is activated by vehicles waiting to turn at the intersection. However, no traffic control devices or other mitigating measures have been proposed by any of the parties, or by the town, and they are not further considered in this decision.

The ability of an intersection to function is measured as the "level of service" (LOS) for the various turning movements through an intersection. At an intersection without a signal, level of service A signifies less than a ten-second wait for drivers at the intersection, down to level of service F, which signifies a longer-than-50-second wait. A project designed to have a level of service of D or E may be acceptable, but only if it is an improvement over an existing poorer level of service, especially in a congested urban context.

As there is no traffic light at the Shaw's/Staples intersection, and there is a left turn lane for southbound traffic waiting to turn left into the Shaw's/Staples driveway, as well as a northbound left turn lane for traffic waiting to turn left into the Mobil/Comfort Inn entrance, the restaurant entrance, or to turn left on Route 62, the level of service for through traffic on Paine Turnpike through the Shaw's/Staples intersection is LOS A now and will remain LOS A if the proposed project is not built, as long as no traffic light is installed. Appellee-Applicant also predicts that the through traffic will remain LOS A if the proposed project is built. However, that analysis assumes that the through traffic will not experience delays through the intersection waiting for traffic to turn right into the project driveway. The evidence showed that it is likely that southbound through traffic will experience delays waiting for larger trucks to turn right onto the project property, and that northbound through traffic will experience delays waiting for larger trucks to turn left from the project property across the intersection, although no quantitative evidence was presented as to whether or by how much those delays would reduce the level of service.

Based on Appellee-Applicant's analysis, which as noted above tends to underestimate congestion, the level of service for the peak hour in 2006 without the proposed project will in any event be LOS F for the Shaw's/Staples drive and for the Mobil/Comfort Inn exit drive. In the design hour, without the proposed project, the level of service will be C for the Shaw's/Staples drive and E for the Mobil/Comfort Inn exit drive. With the proposed project, by Appellee-Applicant's own analysis, the level of service in the peak hour would be F for the proposed project as well as for the Shaw's/Staples drive and for the Mobil/Comfort Inn exit drive. In the design hour, with the proposed project, the level of service will degrade to D for the Shaw's/Staples drive and F for the Mobil/Comfort Inn exit drive. Moreover, the F levels of service shown for these various turning movements would lengthen to as much as a six-minute delay at the intersection, which is an unacceptable level by any measure, and which can be expected to prompt impatient drivers to make improper and unpermitted uses of the various intersections, such as exiting out the Mobil/Comfort Inn entrance drive.

One reason for the unacceptably long delays at the intersection with the proposed project is the added left-turning traffic exiting the project site towards Route 62, moving through the intersection at the same time as traffic from Shaw's/Staples also attempts to turn through the intersection. Another reason is the short distance between the proposed project driveway and the Mobil/Comfort Inn exit driveway, which during high-volume times of day will cause southbound vehicles (especially tractor-trailer trucks) waiting to turn into the project driveway to block the Mobil/Comfort Inn exit driveway.

The proposed on-site circulation is also barely adequate for a single large[6] tractor-trailer truck, and will not accommodate several tractor-trailers on the site at any given time without serious conflict. A WB-62 tractor trailer will be able to negotiate the turn onto the project site without entering the opposing traffic lane, but only by traveling over the mountable curbing on the northerly side of the entrance and at the same time traveling over the painted island dividing the entrance and the exit lanes. A left-turning tractor trailer truck exiting the project site must also drive over that painted 'island.' If both those maneuvers are attempted at the same time, there is ample opportunity for conflict between them, or for one of the turning trucks to have to avoid the conflict by swinging out into the opposing traffic lane. Similarly, there is just enough turning

radius and sweep path for a WB-62 tractor-trailer truck to turn on the property after fueling on the north side of the diesel pump island, so as to be able to exit the property, but only if no tractor-trailers or other vehicles are parked in the sweep path to the rear of the building. However, a tractor-trailer that used the drive-up window would have to swing to the right, through that diesel fueling position, to be able to make the turn without having to perform a sequence of front and back movements to accomplish a broken U-turn. Similarly, a tractor-trailer vehicle using the southerly side of the diesel pump island would have to perform a sequence of front and back movements to be able to turn to exit the property.

The turning movements of those vehicles onto such a narrow lot, and through an already compromised intersection, will adversely affect the traffic at the Shaw's/Staples intersection. The likelihood of large vehicles queuing to enter the project site will also substantially impair the use of Appellant's adjacent property. The on-site circulation is inadequate for multiple tractor-trailer trucks to maneuver or park on the property at the same time. Accordingly, approval of the proposed change to a nonconforming use must be denied[7] under § II(12)(1)(b) as it will substantially impair the appropriate use or development of adjacent property. Approval of the proposed site plan must be denied under § II(10)(3)(b) as the on-site circulation and parking is inadequate for the anticipated vehicular use, and the design of the access onto Paine Turnpike will have an adverse impact on the adjacent street network. Conditional use approval must be denied under § II(7)(a)(2) and (3) as the proposed use will adversely affect traffic on the roads and highways in the vicinity, including the levels of service at least at the Shaw's/Staples intersection with Paine Turnpike and at the Mobil/Comfort Inn exit to Paine Turnpike, and will therefore adversely affect he neighboring use.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that approval of the proposed project is denied under § § II(7)(a)(2) and (3); II(10)(3)(b); and II(12)(1)(b), without prejudice to Applicant's future application to the DRB for any different or differently-designed proposal for the property.

Done at Barre, Vermont, this 29th day of July, 2002.


_____
Merideth Wright
Environmental Judge



**Footnotes**

1. The front property line is not shown on the 'conceptual site plan' filed with the Court on March 4, 2002, after the hearing in this matter, but it is shown on an earlier version of the site plan entered into evidence as Exhibit 1 at trial.

[2.] The application materials do not disclose whether these islands are proposed to accommodate six or twelve fueling positions; that fact might affect the traffic expected to be generated by the proposed project.

[3.] This number was derived from a count made at Appellant's neighboring Mobil station, which has a convenience store and gasoline station but no fast-food window. Appellee-Applicant did not use figures predicted by national traffic engineering data for this use based on the number of fueling positions or the square footage of the convenience store.

[4.] However, for the analysis below we use the traffic expert's estimate of 6% truck traffic.

[5.] We also note that the traffic standard refers to the effect of a project on traffic on the 'roads and highways in the vicinity', yet Appellee-Applicant did not analyze the effect, if any, of the additional traffic from the proposed project on the Paine Turnpike/Route 62 intersection.

[6.] The proposed site plan shows the travel path and sweep of a WB-62 (69-foot-long) tractor-trailer truck; however, Appellee-Applicant has not provided a similarly complete analysis for the larger WB-67 (74-foot-long) tractor-trailers now allowed to travel on Vermont highways and within two to three miles of the highway interchanges.

[7.] No lighting plan was presented to the Court from which we could determine whether the lighting would be adequate and not cause a problem with glare; however, the lack of a lighting plan does not change the result based on the traffic and site circulation issues.